# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

**DANIEL WOOD**                                                   **PLAINTIFF**

**v.**                                                **No. 3:16CV42-MPM-RP**

**DESOTO COUNTY SHERIFF'S**
**DEPARTMENT, ET AL.**                                  **DEFENDANTS**

## MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Daniel Wood, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The defendants have filed three motions [77], [121], [140] for summary judgment, each of which has been fully briefed. The matter is ripe for resolution. For the reasons set forth below, the motions by the defendants for summary judgment will be granted, and judgment will be entered for the defendants in all respects.

## The Plaintiff's Remaining Claims

Mr. Wood's allegations occurred during the time he spent at the DeSoto County Jail awaiting prosecution on criminal charges beginning July 2, 2014. One claim remaining in this case is that defendants Chad Wicker, April Box, and Dr. Kenneth Thompson failed to provide the plaintiff with adequate medical care on four occasions. First, Wood alleges that defendants Dr. Thompson and "Head Nurse" April Box "refused to give antidepressant or anti-anxiety medications" during the first month of his stay at the DeSoto County Jail. Doc. 22, Magistrate Judge's Report and

Recommendation. Second, Wood claims that "during the 29-day placement on suicide watch (from September to October 2014)" he was provided no medical treatment. *Id.* Wood's third claim of denial of medical treatment is that "the tower officer would not open his door to receive his medications from the on-duty nurse (from July to August 2015)." *Id.* According to Wood, "during med pass, the tower officer would open the cells of every inmate on the medication list except him." *Id.* Wood's fourth claim regarding medical treatment is that defendant Chad Wicker improperly removed him from suicide watch. Docs. 52, 54.

Wood also alleges that during the "29-day placement on suicide watch (from September to October 2014)," there was water in his cell from a leaky toilet and that he suffered periods of extended cold. Doc. 22. He alleges that defendant Chad Wicker should have noted the conditions and had them corrected.

Wood finally alleges that Chad Wicker "allow[ed] [Wood's] legal and religious mail but not any personal mail from family or friends." Doc. 60.

## Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)).

After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992).

The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963

Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986), "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 871-73, 110 S.Ct. 3177, 3180 (1990), "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir. 1994). It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990). In considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita, supra*. (emphasis added). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

In considering a motion for summary judgment, once the court "has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, [the ultimate decision becomes] purely a question of law." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

## Undisputed Material Facts

The facts set forth below are not in dispute, as they are supported by overwhelming documentary evidence in the record. The plaintiff relies almost exclusively on statements in his motions and pleadings, while the defendants have provided authenticated documentary evidence, often from multiple sources. For the purposes of the instant motions for summary judgment, the court will construe them in the light most favorable to the non-moving party (the plaintiff in this case).

## Facts Regarding Denial of Medical Treatment

Wood first alleges that the defendants failed to treat him "for the first month of his incarceration at the DeSoto County Jail." Report and Recommendation, Doc. 22 at 5. Mr. Wood alleged that he "received no medication for anxiety and depression for a month." *Id.* at 1. Wood mistakenly states that defendant April Box was the "Head Nurse" and that she refused to give antidepressant or anti-anxiety medications." *Id.* at 2. Wood entered the DeSoto County Adult Detention Facility on July 2, 2014. April Box is not a nurse, but a secretary. She states:

> I work at the DeSoto County, Mississippi Adult Detention Center . . . . My job title is Medical Administrator. I prepare paperwork, do filing, order supplies, set up appointments, process grievances, and perform general secretarial work. I worked at this job in 2014 and 2015 when inmate Daniel Nathan Wood, also called Daniel Wood, was held at the Detention Center. I prepared a summary of medical treatment provided to Wood attached as pages 34-35.
>
> I am not now and I have never been a nurse. I perform secretarial and clerical support functions for health care services or providers in the Detention Center.

Doc. 77, Exh. 1, pages 34-35. Ms. Box also states "I am not now and I have never been a nurse. I perform secretarial and clerical support functions for health care services or providers in the Detention Center." In addition, she states that from

July through August 2014 inmate Daniel Wood received health care services at the

Detention Center. This covers the first month of his incarceration at the Detention Center. Wood arrived at the Detention Center on July 2, 2014. He was provided treatment on July 2, 2014 by being placed on suicide protocol. See page 1. Wood was again placed in suicide protocol for proper treatment on July 8, 2014. See page 2. Region 4 was contacted and a hold placed on Wood. Region 4 refers to a regional health care facility. Region 4 was again contacted for Wood on July 23, 2014. See page 3.

Doc. 77-1 at 1. Further:

[i]n July through August 2014 inmate Daniel Wood received health care. See pages 8-11 for multiple entries of health care doctors visit history. See pages 14-27 for the medication dispensed to Wood history and specifically pages 14-17 for July through August 2014. The medication detail record pages 28-29 reflect the prescriptions obtained for Wood and dispensed. For July through August 2014 see entries on page 28 from July 9, 2014 through August 15, 2014.

*Id.* at 2.

Though the defendants requested Wood's medical records from Parkwood, they did not receive those records:

Wood claimed he had been treated at health care facility Parkwood before incarceration at the Detention Center. He was provided a consent form and signed same so the Detention Center could get a list of current medications. This was sent to Parkwood on or about July 2, 2014. See page 16. Parkwood was contacted but had not sent health care records to the Detention Center on Wood by July 9, 2014. On this date Wood began a prescription for Risperdal ordered by Dr. Thompson. See my entry at p. 30 first paragraph. See p. 36 for July 9, 2014 prescription medicine from Funderburk's Pharmacy for Daniel Wood at the DeSoto Co. Jail provided by the Detention Center. July through August 2014 detainee medical notes are at pages 30-32.

*Id.*

Kenneth Thompson, M.D. executed two affidavits regarding Daniel Wood's treatment. Docs. 77-3, 140-1. Dr. Thompson is not an employee of the DeSoto County Adult Detention Facility; instead, he serves under a services contract as the Medical Director at the De Soto County, Mississippi Adult Detention Center ("DeSoto County Jail"). *Id.* at 25-31. That agreement was in effect for 2014 and 2015. *Id.* at 1. He is a licensed physician in the State of Mississippi, serves as the DeSoto County Adult Detention Facility Medical Director, and provides emergency room physician services at

multiple hospitals.  *Id.*  The defendants provided the following documents regarding Wood's medical

care while housed in the DeSoto County Detention Facility:  (1) a summary of medical services

provided to Mr. Wood (Doc. 77-3 at 6-7); (2) a detailed list of medications provided to Wood (*Id.* at

8-9); (3) a history of Wood's doctor's visits (*Id.* at 14-22); and (4) Thompson's handwritten notes as to

his treatment of Wood on July 28, 2014, and August 15, 2014 (*Id*. at 23-24); and (5) an Expert Report

of David Brooks, M.D. (Doc. 140-2).  Much of the documentary evidence is duplicated in the three

motions for summary judgment.

Dr. Thompson prescribed medication in the first month Wood was at the Detention Center.

Doc. 77-3 at 8-9, 140-1 at 3-4.  Wood stated that he suffered from hallucinations.  Doc. 77-3 at 23-24.

When Wood entered the facility he was not in an emergency medical condition.  *Id.* at 2.  Upon

Wood's arrival at the jail, Dr. Thompson needed to determine what, if any, medications or street

substances may have been in Wood's system.  *Id.*  Dr. Thompson wanted to ensure that new

medications provided to Wood would not adversely react with substances Wood may have taken prior

to his arrival.  *Id.*  Dr. Thompson waited a week to issue Wood's first prescription to allow sufficient

time for the levels of substances in Wood's system to decline so that Thompson could safely

administer new medications.  *Id.*  Dr. Thompson prescribed Risperdal for Wood on July 9, 2014,

added Paxil on July 28, 2014, and increased the Risperdal dosage from 4 mg to 6 mg on July 28,

2014.  Doc. 77-3 at 23.  Dr. Thompson's handwritten notes reflect that he saw Wood on July 28, 2014,

and August 15, 2014.  *Id.* at 23-24.  In addition, Wood's prescription medications were dispensed to

him as prescribed by Dr. Thompson from July through August 2014.  *Id.*  at 8-9.

Nurse Terri Caldwell's statement is consistent with that of both April Box and Dr. Thompson.

Doc. 77-2.  Nurse Caldwell saw Wood on July 15, 2014, regarding his complaint about

"hallucinations and other things."  Doc. 77-2 at 1.  At that time Nurse Caldwell got Wood to sign a

consent form so he could see Dr. Thompson. *Id.* at 5. Medical staff dispensed Wood's medication to him regularly during the relevant periods of his stay at the Detention Center, and he accepted the medication except for a handful of occasions. *Id.* at 11-24. This holds true for the period in question. *Id.* at 11-14. Nurse Caldwell personally assisted in dispensing this medication to Wood.[1]

### Facts Regarding Cold and Wet Conditions in Cells 146 and 148

The Magistrate Judge's Report and Recommendation describes the timeframe for Wood's claim regarding the conditions of cell during the "29-day placement on suicide watch (from September to October 2014)." Doc. 22 at 5, 9. Wood entered the facility as a pretrial detainee and was later convicted and sentenced. He was booked into the DeSoto County Adult Detention Facility on July 2, 2014 and, upon conviction, received credit on his 15-year sentence for 625 days' time served. Doc. 77-7 at 1-4. Wood's claims all arise within that timeframe. The Detention Center has a reporting and inspection process to correct any problems with cell conditions. Doc. 77-6 at 3. No one reported any such problems. *Id.* at 2-3. The State of Mississippi inspected the Detention Center on September 4, 2014, and found none of the deficiencies Wood has alleged. Doc. 77-12.

The old jail was closed on October 22, 2015, no longer houses inmates; all inmates are now housed in new facilities. Docs. 77-6 at 1-2. The area marked G tank is where Wood was sometimes housed; other times he was housed in cells 146 and 148 of the old jail. *Id.*, 77-11 at 24. Wood was housed in either cells 146 or 148 from October 7, 2014, to October 28, 2014. Doc. 77-6 at 2. This was the time and location that Wood describes as an extended 29-day suicide watch, though the time

---

[1] It appeared at first on the Detainee Medication Dispense History that, for a number of entries, a discrepancy exists between the amount of medication dispensed and whether the medication was accepted. For those entries, the "Dispense Qty" is zero, yet the box is checked indicating that Mr. Wood accepted pills. The defendants provided two affidavits (Docs. 77-4, 77-5) explaining the idiosyncrasies of the tracking system, which automatically fills the "Dispense Qty" with "0" or "1" when an entry is created. However, the actual quantity of medication to be dispensed in either case is one. The nurse manually enters the "Dispense Qty" only when that number is more than one. Thus, even when the "Dispense Qty" of an entry reads "0," the nurse dispensed one pill on that occasion.

frame was only 21 days. *Id.* Wood was housed in these locations because they were available individual cells. *Id.* During the time frames of Wood's complaint, DeSoto County was, in phases, building a new Adult Detention Facility. *Id.* The first phase was not big enough to house all of the Detention Center's inmates; as such, some of the individual cells at the old jail had to be used for medical reasons (such as suicide watch) or for individual protective custody. *Id.* Inmates like Mr. Wood, facing charges of sexual assault on a young child, sometimes require individual protective custody. *Id.*

G Tank was available for both suicide watch and protective custody. *Id.* Indeed, Wood occasionally requested to remain on protective custody. Doc. 77-6 at 22-25. There is no record of extended periods of cold or wet conditions during the time Wood was in the old jail on extended suicide watch. Inspections revealed no such problem in either cell during that time, as shown by inspection records from the Mississippi State Department of Health for 2014 and 2015 for the old jail – as well as reports for *Gates v. Phil Bryant, et al* in the United States District Court for the Northern District of Mississippi in cause No. 4:71CVJAD. Doc. 77-12. Indeed, one inspection conducted by the State Department of Health in August 2014 revealed no cold or wet conditions. *Id.* at 26-30.

Chad Wicker personally inspected the cells in the old jail on a weekly basis and observed no leaking toilet water, standing water, or extreme cold. *Id.*, Doc. 77-14. In the ordinary course of business, such conditions are reported to maintenance for repair, and Mr. Wood submitted no grievances regarding these cell conditions during the time relevant to his claims in this case. Docs. 77-6 at 3, 77-10 at 1-39. The entries in the inspection records reveal that Mr. Wicker routinely submitted repair orders for the various problems his inspections unearthed, as well as the resolution of the problems. Doc. 77-14

Environmental conditions at the old jail were set to cycle between 68° F and 72° F by a computer-controlled central heating and cooling system maintained by Siemens, an outside contractor. Doc. 77-13 at 1-8. The system controlled air conditions for all tank cells, all tank day rooms, the medical area, the booking desk, and individual cells 146 and 148 (where Wood's 21-day individual cell watch took place). There is no record that the old jail was excessively cold in about September through October of 2014, and the system, whether heating or cooling, was programmed to maintain jail temperature within 2° of the setpoint temperature of 70° F. *Id.*

Wood stated that Benjamin Lee Rodriguez witnessed cold wet conditions in cells 146 and 148; however, Rodruiquez and Wood were never housed in the same cell at the same time, and Rodriguez never had an opportunity to see inside Wood's cell (146 or 148). Doc. 77-11 at 15-19. Indeed, Rodriguez was never housed in the area where cells 146 and 148 are located. *Id.* Also, Rodriguez's affidavit mentions excessively hot conditions in the "summer" and excessively cold conditions in the "winter," but does not mention the months of September and October – the times relevant to the instant case. Rodriguez even mentions that ice formed on the jail walls at times; however, that could not have happened during September and October of 2014, as the temperature during those months never dipped below 40° F.

Robert Jarman serves as the department head in charge of buildings and grounds for DeSoto County, Mississippi. Doc. 77-13, Affidavit of Robert Jarman. He inspects and maintains county-owned buildings, including the DeSoto County Detention Center, including the old jail. *Id.* The old jail has been closed, no longer houses inmates, and new facilities now house all DeSoto County inmates. *Id.* Inspection records covering the 21-day period Wood was placed on extended suicide watch reveal no leaky toilets, standing water, or cold temperatures. Doc. 77-12. Indeed, one inspection took place in August 2014, and reflects none of the deficiencies Mr. Wood describes in his

complaint.  *Id.*  In the regular course of business, conditions such these would have been scheduled for repair.  *Id.*  Those same records show that, during that time, similar deficiencies in other locations throughout the DeSoto County Detention Facility and old jail were reported and repaired.  Doc. 77-13 at 9-19.

The weather in Hernando, Mississippi during the time in question (September to October 2014) was mild to warm.  Doc. 77-16.  In September, the average high temperature was 83.9° F, and the average low was 62.7° F.  *Id.*  On September 14, 2014, the high temperature was 65° F, making it the coolest high temperature of September.  *Id.*  September 24, 2014, had the coldest nighttime temperature: 52° F.  October 2014 in Hernando was a bit cooler, with an average high temperature of 75.65° F and an average low of 52.45° F.  *Id.*  October 24, 2014, had the coolest high temperature of the month of 62° F, while the coolest nighttime temperature, 40° F, occurred on October 29, 2014.  *Id.*

### Facts Regarding Removal from Suicide Watch

Mr. Wood requested in Docs. 52 and 54 to amend his complaint to add several claims, one of which is that Chad Wicker improperly released him from suicide watch and that his "removal from suicide watch is an act of deliberate indifference to [his] well being and . . . safety."  Doc. 54.  As set forth in the Magistrate Judge's Report and Recommendation, Mr. Wood first alleged that Mr. Wicker's decision to place him on extended suicide watch was an act of retaliation.  Doc. 22 at 5-8.  In essence, Mr. Wood alleged that *he stayed on suicide watch for too long*.

However, in his objections to the Report and Recommendation, Mr. Wood argued:

What I meant was Mr. Wicker released me from suicide watch himself without the benefit or opinion of a medical professionals opinion or in fact having anyone at all to see my prior to release me from suicide watch to ask if I felt suicidal still.  Mr. Wicker didn't even speak to me in person himself, to clarify.

Doc. 24.  Thus, he alleged, essentially, that *he did not stay on suicide watch long enough* – and that Mr. Wicker did not have the authority to remove him from suicide watch.  In adopting the Magistrate

Judge's Report and Recommendation, the court did not specifically address Wood's "clarification" of his retaliation claim in his objections, which would have transformed it into either a claim for denial of medical treatment or of improper custody classification. The court simply dismissed the retaliation claim. The court later permitted Mr. Wood to amend his complaint to include this new claim because it had not been directly addressed and is based on facts already alleged earlier in the proceedings.

### Facts Regarding Tampering With Mail to and from Family or Friends

Mr. Wood also alleges that, "I have found evidence of staff including defendant Chad Wicker admitting to allowing my legal and religious mail but not any personal mail from family or friends." Doc. 60. The "Inmate Correspondence" Policy (12.09) of the DeSoto County Adult Detention Facility allows "eligible inmates to correspond with their attorney, family, friends, officials, and other significant contacts with a minimum of interference, as long as the correspondence is carried on in a manner consistent with the rules of the facility." Doc. 121-2 at 1.

Policy 12.09 includes as the stated penological interest:

It is in the penological interest of this detention facility to provide inmates with reasonable means of communication with others outside of the facility, as long as the communications is consistent with security, safety and other objectives of the operation.

*Id.* The procedure describes means of access and some restrictions. *Id.* at 1-7. Writing materials are provided at no cost to indigent inmates. *Id.* at 3

Director Wicker described the handling of mail from family or friends in the jail:

I am the Director of Detention Services of the DeSoto County Adult Detention Facility. I have first hand knowledge of the making of the attached records with pages 1-3 which is policy 12.09 of the DeSoto County Adult Detention Facility on subject "Inmate Correspondence"signed by DeSoto County, Mississippi Sheriff Bill Rasco with issue date of January 1, 2015. The attached page with the title at the top of "Mail" is an excerpt from the Inmate Handbook and described the mail system for the inmates. The policy and inmate handbook excerpt refer to a mail system in use during the detention of Daniel Wood at the DeSoto County Adult Detention Facility."

The inmate correspondence system also called the smart jail mail system included as a

component the use of a kiosk available to the inmates including Daniel Wood. Daniel Wood had access to and used this kiosk which transmitted mail as email. The system was and is significant in enhancing safety and security, is a great help to contraband interdiction, is efficient, is a cost savings system, and provides inmates a much faster delivery and response communications system than just paper mail.  The average number of messages from and to inmates by use of the kiosk is about 26,000 per month.  If someone such as a family member of an inmate has an issue with use of email due to whatever reason but reasons may include computer illiteracy, no access to a computer, or no access to the internet then an exception may be made upon request to allow use of U.S. Mail.

Doc. 121-1.  Attached to the affidavit are records of U.S. Mail delivered to Wood , which he signed for.  Doc. 121-14.

Mr. Wood met with Director Wicker on February 4, 2016, and discussed complaints about mail.  *Id.*  at 1.  Director Wicker listened to Wood's complaints, responded to each complaint, explained the mail policy in person, and explained that the repair part for the mail kiosk had been received that day with the repair scheduled to be completed later that same day.  *Id.*

Wood had ample opportunity to correspond with friends and family, as shown by the 262 pages of approximately 500 communications between Wood and his family and friends (some of whom refused to communicate with him).  Docs. 121-3 to 121-13.  That "mail system was in place and in use in 2014 and until Wood left in 2016."  Doc. 121-1 at 2.  As set forth above, the policy gave jail staff leeway to make exceptions to the electronic mail requirement on a case by case basis.  *Id.* Wood stated that he checked the mail kiosk every day.  Doc. 121-5 at 9.  Wood used some "20 envelopes" in addition to the kiosk.  *Id.* at 17.  Wood was trying to use the lawsuit to bargain for a lighter sentence.  Doc. 121-5 at 9.  Thus, Wood had innumerable opportunities to communicate with his friends and family.

**Analysis of Claims**

Mr. Wood brings claims for denial of adequate medical care, unconstitutionally harsh general conditions of confinement, and mail tampering. As discussed below, on the record before the court, none of these claims has merit.

### Denial of Adequate Medical Treatment

In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id.* Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). This same subjective deliberate indifference standard applies to pre-trial detainees under the Fourteenth Amendment as well as convicted inmates under the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996). In claims arising from delayed medical attention rather than a clear denial of medical attention, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay in

order to state a claim for a civil rights violation. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Campbell v. McMillin*, 83 F. Supp. 2d 761 (S. D. Miss. 2000). A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir.2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

"Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

As set forth in the undisputed facts above, Mr. Wood received continuous medical care throughout his stay in DeSoto County. Dr. Thompson delayed providing Mr. Wood with psychotropic medication for the first week of his stay at the jail to allow time for prescription and street drugs to process out of his system; thus, the delay was not a failure to treat Wood, but a part of the treatment. After that week expired, Dr. Thompson prescribed various medications to treat Mr. Wood's mental and physical problems, including stomach trouble and an infected toe. During the first month of Mr. Wood's stay at the jail, he was prescribed Risperdal on July 10, 2014, and received it daily from July 10, 2014, through August 2, 2014, with the exception of July 10, July 11, and July 14, 2014. Doc. 140-1 at 3-4; *id.* at 31-32. Wood refused the Risperdal on July 10; it seems not to have been offered to him on July 11 or July 14. When one antidepressant seemed not to work, Dr. Thompson would

prescribe another. When Wood had a serious adverse reaction (a form of stiffened muscles) to the antipsychotic drug Risperdal, Dr. Thompson terminated the prescription and prescribed Benadryl to ease the symptoms. Medical staff treated him as he recovered from the Risperdal side-effect of rigid muscles, by monitoring his recovery and ensuring he received sufficient nourishment.

Mr. Wood's allegation regarding tower officers not opening his cell door so he could receive his medication is likewise without merit. The parties dispute whether officers refused to open the door for medication call, but that dispute is not material, as the medical records reveal that, even if there were occasions when Mr. Wood did not receive his medication at the normal pill call time, he nonetheless received that medication regularly throughout the time he remained on extended suicide watch.

Wood's final medical claim is that Chad Wicker did not have the authority to remove him from suicide watch. This claim is wholly without merit. As set forth above, under the policy in effect at the DeSoto County Detention Facility at the time, Chad Wicker, as the jail administrator, is one of the persons permitted to remove an inmate from suicide watch. Wood is simply mistaken in his belief that only staff members from the Regional Health Center may evaluate an inmate for removal from suicide watch.

Mr. Wood has not established that the defendants in this case were deliberately indifferent to his serious medical needs. The medical records establish that he received medical care on a regular basis during his stay at the DeSoto County Detention Facility. Medical staff examined and treated Mr. Wood repeatedly for his medical and psychological problems. He was treated with medication and by placement on suicide watch. When one course of treatment seemed not to work, medical doctors and staff tried others until they found one that did. As Wood has not shown that "[medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar

conduct that would clearly evince a wanton disregard for any serious medical needs," his claim for denial of adequate medical treatment is without merit, and judgment will be entered for the defendants as to that issue. *Brauner*, 793 F.3d at 498.

### General Conditions of Confinement

"[T]he Eighth Amendment may afford protection against conditions of confinement which constitute health threats but not against those which cause mere discomfort or inconvenience." *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir.1989), *cert. denied*, 493 U.S. 969 (1989)(citation omitted). "Inmates cannot expect the amenities, conveniences, and services of a good hotel." *Id.* at 849 n.5 (citation omitted). Prison officials have certain duties under the Eighth Amendment, but these duties are only to provide prisoners with "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care . . . ." *Woods v. Edwards*, 51 F.3d 577, 581 n.10 (5th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Mr. Wood offers only the bald allegation that, during his placement on extended suicide watch, the temperature in his cell was often unreasonably cold – and standing water collected on the floor of his cell. However, the documentary evidence presented by the defendants shows that those conditions simply did not exist. As set forth above, both Director Chad Wicker and state officials unaffiliated with the jail performed multiple *independent* inspections before, during, and after the time of Wood's complaint. Though the inspections revealed deficiencies, none of those deficiencies involved cold or wet conditions in the cells at issue – numbers 146 and 148 in the old jail. Director Chad Wicker conducted weekly inspections of all jail facilities and noted many deficiencies during these inspections, and he directed jail personnel to cure those deficiencies. Wicker did not, however, note cold or wet conditions in cell 146 or 148. Further, the heating and cooling system at the old jail was

maintained by an outside contractor and set to keep temperatures in all parts of the old jail within two degrees of 70° F, and the weather during the time at issue was, by and large, mild to warm.

Taking into account the "totality of the circumstances," *McCord v. Maggio*, 910 F.2d 1248 (5th Cir. 1990), the instant claims do not rise to the level of a constitutional violation. Mr. Wood has not identified and provided proof of any "basic human need" which he was denied for an unreasonable period of time. *See Woods*, 51 F.3d at 581. As such, judgment will be entered in favor of the defendants as to this claim.

## Mail Tampering

Mr. Wood alleges that Director Chad Wicker interfered with his ability to communicate with family and friends through the jail's mail system. Wood has not alleged that his access to the court's was impaired. As to outgoing mail, in order for the plaintiff to prevail on his claim of unconstitutional mail tampering, he must prove: (1) that the prison officials intentionally confiscated his outgoing mail, and (2) that the confiscation of the plaintiff's mail resulted in actual harm to him. *Wolff v. McDonnell*, 418 U.S. 539, 575-77 (1974), *Brewer v. Wilkerson*, 3 F.3d 816, 824-25 (5th Cir. 1993), *Lewis v. Casey*, 518 U.S. 343, 349 (1996), *Jones v. Greninger*, 288 F.3d 322, 325 (5th Cir. 1999). In the case of incoming mail, Mr. Wood must show that the restriction is not "reasonably related to a legitimate penological interest." *Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S. Ct. 1874, 1881, 104 L. Ed. 2d 459 (1989).

In this case, however, Mr. Wood has provided not proof supporting an allegation that his mail was censored or restricted in any way. To the contrary, all of the documentary evidence shows that Mr. Wood's incoming and outgoing mail flowed freely between him and his family and friends. Absent proof of censorship, Wood's claim for denial of the right to free speech through mail

tampering does not rise to the level of a constitutional claim, and must, therefore, fail. *Brewer v. Wilkerson*, 3 F.3d 816, 824-25 (5th Cir. 1993).

Put simply, Daniel Wood's mail tampering claim is frivolous. The undisputed record reveals that he had unfettered access to an electronic mail kiosk and sent literally hundreds of emails to family and friends. On a single occasion, the kiosk broke, and Mr. Wood complained. Mr. Wicker met with Wood on February 4, 2016, discussed the problem with the kiosk, and informed him that the repair part had been received and that a repair was scheduled that same day. Mr. Wood has not pointed to a single occasion when any defendant interfered with either his incoming or outgoing mail. The defendants are entitled to summary judgment on this claim.

### Failure to Exhaust Administrative Remedies as to Wood's General Conditions of Confinement Claim

Mr. Wood's claim regarding cold and wet conditions in cells 146 and 148 also fails because he did not exhaust jail administrative remedies before filing the instant suit. Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* – including its requirement that inmates exhaust their administrative remedies prior to filing suit – in an effort to address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress meant for the exhaustion requirement to be an effective tool to help weed out frivolous claims from the colorable ones:

> Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts. *Woodford v. Ngo*, 548 U.S. 81, 94, n. 4, 126 S.Ct. 2378 (2006) (slip op., at 12, n.4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of non-meritorious claims does not submerge and effectively preclude consideration of the allegations with merit. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit. *Jones v. Bock*, 549 U.S. 199, 203 (2007).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); see also *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine

whether litigation is being conducted in the right forum at the right time, . . . judges may resolve

factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. The

Supreme Court has also recognized the need for a prisoner to face a significant consequence for

deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given
> a fair opportunity to consider the grievance. The prison grievance system will not
> have such an opportunity unless the grievance complies with the system's critical
> procedural rules. A prisoner who does not want to participate in the prison grievance
> system will have little incentive to comply with the system's procedural rules unless
> noncompliance carries a sanction . . . .

*Woodford* at 95.

The DeSoto County Detention Facility has an established grievance procedure – one that

Mr. Wood used many times during his stay there. Docs. 77-6 at 3, 77-10 at 1-39. Wood did not,

however, file a single grievance regarding cold and wet conditions during his stay in cells 146

and 148 in the old jail. *Id.* As such, he has not exhausted administrative remedies as to these

allegations, and they must be dismissed for that reason. Judgment will be entered in favor of the

defendants as to Wood's claims regarding the general conditions of his confinement.

## Conclusion

For the reasons set forth above, none of the plaintiff's claims has substantive merit, and he

failed to exhaust his claim for cold and wet conditions during his extended stay on suicide watch. As

such, the motions [77], [121], [140] by the defendants for summary judgment will be granted, and

judgment will be entered if favor of the defendants in all respects.

**SO ORDERED**, this, the 24th day of May, 2017.

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**